**A F F I D A V I T**

1.   I, Joshua Arambulo, being duly sworn, declare as follows: I am a Special Agent ("SA") with the United States Department of Labor, Office of Inspector General ("OIG"), Office of Investigations – Labor Racketeering and Fraud, and have been so employed since March 2017.  As a Department of Labor OIG Special Agent, my duties include investigating fraud, waste, and abuse of various Department of Labor programs.  I have conducted investigations of criminal activity involving unemployment insurance fraud, workers' compensation fraud, and labor racketeering.  I have been a sworn Federal Law Enforcement Officer since February 2006.  Prior to my employment with the Department of Labor OIG, I was an Immigration Enforcement Agent and Deportation Officer with Immigration and Customs Enforcement (ICE). I am a graduate of the Criminal Investigator Training Program at Federal Law Enforcement Training Center, located in Brunswick, Georgia.

2.   I am working with Department of Labor, Office of Labor-Management Standards Investigator Troy Krouse ("Investigator Krouse") in the investigation of the subject in this affidavit.  The information set forth in this affidavit is based upon my conversations with Investigator Krouse, my examination of reports and records provided by Investigator Krouse, and my training and experience.  As this affidavit is being submitted for the limited purpose of securing the requested search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause for the requested warrant.

**PURPOSE OF AFFIDAVIT: SEARCH WARRANT**

3.   This affidavit is made in support of a search warrant for the residence of AJA JASMIN, who embezzled from her union, for evidence of violations of <u>18 U.S.C. §§ 1341</u>, <u>1343</u>, and <u>1957</u>, Mail and Wire Fraud and Engaging in Monetary Transactions with Fraud-derived Funds (the "Subject Offenses"), as set forth in Attachment B:

a.   116 ROUNDUP ROAD, GLENDORA, CA 91741 ("JASMIN'S RESIDENCE").  JASMIN'S RESIDENCE is a detached single family, one story house that is located one residential lot away from the southwest corner of Roundup Road and South Hacienda Avenue.  When facing JASMIN'S RESIDENCE, there is a driveway to the right side of the house, which leads to a garage structure adjacent to the backyard.  The house is light blue in color with white trim.  The house has white double doors as a front entry.  The garage structure is light blue in color with white trim; and the garage door is white.  The numbers "116" are painted on the curb to the left side of the driveway entrance.  The lot for JASMIN'S RESIDENCE is bounded to the right by a wooden fence and to the left by a brick fence.  The premises to be searched encompasses the entire lot, including vehicles parked on it that are owned or controlled by AJA JASMIN.

**BACKGROUND REGARDING THE VICTIM UNION**

4.   The International Chemical Workers Union Council ("ICWUC") Local 350C ("Local 350") is a labor union representing approximately 230 members who are employees of the Southern California Gas Company. The members of Local 350 work in a variety of positions for the Southern California Gas Company ("SoCalGas"), with duties including: distribution and storage of gas, planning for new gas lines, and

bank account statements were included as part of the financial reports JASMIN submitted.  In order to mask the ongoing scheme of fraudulently obtaining union funds, JASMIN provided forged bank statements to the ICWUC which showed the balances in Local 350's bank accounts as having tens of thousands more in assets than what was actually in each account.  This was accomplished by altering the bank statements to add a "1" before each balance to make it appear that the Local 350 accounts had $10,000 more than what was actually in each account.  In addition, JASMIN provided forged bank statements in these financial reports to hide non-sufficient fund charges that accrued in Local 350's checking account.

**A.  JASMIN Wrote Checks to Herself from Local 350's Account by Forging the Signatures of Other Account Signatories**

8.   Investigator Krouse interviewed LaDasha Morris ("Morris"), former Local 350 Financial Secretary from 2015 to 2018.  Morris informed Investigator Krouse that she was the financial secretary only in name because JASMIN was handling all the financial activities for Local 350.  When appointed financial secretary, Morris initially asked JASMIN to be added to Local 350's bank account as a signatory, but JASMIN never followed through with Morris's request.  As financial secretary, Morris never wrote a check and never saw any bank statements, as JASMIN was the only person with access to Local 350's bank statements.  Local 350's bank statements were addressed to P.O. Box 5004, Covina, CA 91723.  According to law enforcement database checks in TLOxp, which uses data provided by Transunion, the credit reporting agency, JASMIN used this address during her tenure as President of Local 350.

1  customer support at various work locations throughout Local 350's
2  jurisdiction.

3      5.   Local 350's members pay their union dues by employer
4  "checkoff," in which SoCalGas deducts the members' dues from their
5  paychecks and sends the payment to Local 350 by electronic deposit
6  into the union's bank account.  Local 350 is then required to pay the
7  ICWUC a monthly per capita tax payment via check.

8      6.   As governed by Local 350's Constitution, Local 350's
9  officer positions consist of President, Financial Secretary,
10  Recording Secretary, and up to four Vice Presidents.

11                     **SUMMARY OF PROBABLE CAUSE**

12      7.   According to Sandy Noble ("Noble"), a data processing
13  specialist for the ICWUC, money had gone missing from the bank
14  accounts of Local 350.  Department of Labor Investigator Krouse
15  subsequently opened a criminal investigation regarding the missing
16  union funds.  Investigator Krouse's investigation revealed the
17  following:

18      a.   From 2013 to approximately August 2018, JASMIN, the
19  former President of Local 350, fraudulently obtained union funds by
20  forging the signatures of two Local 350 officers that were designated
21  signatories on the local's checking account.  JASMIN also made
22  payments to her personal credit cards, for personal expenses,
23  directly from Local 350's checking account without membership
24  authorization.

25      b.   JASMIN was solely responsible for submitting monthly
26  financial reports to the ICWUC, as required by their Constitution,
27  and was the only person with access to Local 350's checkbook, bank
28  accounts, and corresponding bank account statements.  Local 350's

9.    Local 350's checking account required two account signatories to sign all checks issued from the Local 350 checking account.  Investigator Krouse conducted interviews with Morris, former Local 350 Recording Secretary Rachel Arguello ("Arguello"), and ICWUC International Representatives Vince Diaz ("Diaz") and Jackie Allen ("Allen").  All affirmed that during JASMIN's tenure as President, the signatories on Local 350's checking account were JASMIN, former Vice President Marvin Turner ("Turner"), and current Vice President Leslie Olah ("Olah").

10.   Subsequent to JASMIN's abrupt resignation following the impending discovery of her fraud (discussed later), Allen, Turner, and Morris gathered bank statements and cancelled checks directly from United Business Bank.  In September or October of 2018, personnel from ICWUC examined the bank statements and cancelled checks, and discovered that JASMIN regularly issued checks to herself.  These checks included JASMIN's signature and the forged signature of either one of the two other signatories, Turner or Olah.

11.   On January 16, 2019, Turner signed a notarized affidavit for the union.  In this affidavit, Turner affirmed that he was shown and examined two sets of copies of checks drawn on Local 350's checking account.  Allen provided Turner with one set of checks dated back to 2013.  Diaz provided Turner with the other set of checks, which included checks dated from August 2017 to August 2018.  Upon examination of the checks, Turner discovered that his signature was forged on sixty-nine checks.  Turner informed Diaz that he had not authorized another Local 350 member or officer to sign his name on checks and that the signatures on the forged checks did not belong to him.  Turner further stated that prior to his examination of the

checks, he had never previously seen the original checks with his forged signature.  To the best of his knowledge, Turner affirmed that the Local 350 checking account checkbook was in the custody and control of JASMIN from October 2013 to August 2018.

12.  On October 10, 2018, Olah signed a notarized affidavit for the union.  In this affidavit, Olah affirmed that she was shown and she examined one set of copies of checks drawn on Local 350's checking account.  This set of checks was provided by Diaz and included checks that were dated from August 2017 to August 2018.  Upon examination of the checks, Olah discovered that her signature was forged on the checks.  Olah affirmed that she had not authorized another Local 350 member or officer to sign her name on checks; and that the signatures on the forged checks did not belong to her.  Olah affirmed that she had not signed any Local 350 checks since on or about the first quarter of 2013.  Olah further stated that prior to her examination of the checks, she had never previously seen the original checks with her forged signature.

13.  According to Investigator Krouse's analysis of the checks written by JASMIN, from June 2018 until August 2018, 49 of the 50 checks written from Local 350's checking account were paid to JASMIN.  Olah's signature was forged on all of these checks.

**B.   JASMIN Made Unauthorized Electronic Payments from Local 350's Checking Account to her Personal Credit Card Accounts**

14.  Per Diaz, upon his examination of the Local 350 bank statements subsequent to JASMIN's resignation in 2018, he learned that JASMIN had been electronically transferring funds from Local 350's checking account to at least one of JASMIN's personal credit cards.  These payment transactions appeared as individual electronic

withdrawals from the local's checking account.  The payees on these transactions were listed as "Citibank," "Chase," "Capital One," and "Cardmember Services" on the checking account statements.  From July 15, 2013 to August 2, 2018, these payment transactions totaled approximately $85,000.  Interviews conducted by Investigator Krouse with other Local 350 officers revealed that these payments were not authorized and were not known to Local 350's officers or members.

15.  Investigator Krouse conducted an analysis of account statements from three credit card accounts belonging to JASMIN.  This analysis was conducted to confirm if payments made to JASMIN's personal credit card accounts were from the Local 350 checking account; and if so, the analysis also sought to confirm if these payments corresponded to any possible union related expenses.

### *Citibank Account Number xxx5585(Account 5585)*

a.  Investigator Krouse's analysis of Account 5585 revealed that JASMIN made nineteen electronic payments from Local 350's checking account to Account 5585, her personal credit card with Citibank.

b.  On November 30, 2013, a payment transaction from Local 350's checking account was made to newly opened Account 5585, in the amount of $1929.05.  At that time the charges that had been made on Account 5585 included: Ivan Breed M.D. ($810) and Van Cleef & Arpels Las Vegas ($864.80).  Per Google queries, Ivan Breen M.D. is a physician located in Covina, California, who specializes in Cosmetic Medicine such as Botox; and Van Cleef & Arpels is a French luxury jewelry, watch and perfume company. No charges on the account at that time appeared to correspond to union activities.

**C.   JASMIN Provided Forged Bank Statements to the ICWUC**

16.   Interviews with Diaz, Allen, Arguello, Morris, and Turner affirmed that in order to transfer funds between union accounts, the approval of the Executive Board was required.  The Executive Board was not aware of and had not authorized JASMIN to transfer funds from the strike fund, defense fund, and savings account to Local 350's checking account.

17.   Investigator Krouse reviewed United Business Bank account statements for all accounts belonging to Local 350 and compared them to the bank account statements that JASMIN provided to the ICWUC in Local 350's monthly financial reports for the period of January 2012 to September 2018.

18.   This review showed that in order to conduct the check scheme and the electronic credit card payment scheme (discussed above), JASMIN made multiple telephonic and online transfers of funds from Local 350's strike fund, defense fund, and savings accounts to the checking account in order to fraudulently obtain union funds. For example, if the balance in the Local 350 checking account was running low, JASMIN would transfer funds from Local 350's defense fund account to the Local 350 checking account.  When the funds were depleted in the defense fund and strike fund accounts, JASMIN altered and submitted fraudulent bank statements to the ICWUC in order to give the appearance that these accounts still had ample funds.  These altered bank statements were submitted to the ICWUC as part of Local 350's required monthly financial reports.

19.   Initially, the altered bank statements contained a "1" in front of the actual account balance; thus, the value of each account was falsely inflated by $10,000.

20.   For example, JASMIN submitted a Local 350 checking account statement, dated April 29, 2016, to the ICWUC. A "1" was added in front of the values for the "Previous Balance" and "Ending Balance" on this statement, which showed as: "$13,339.56" and "$12,170.79", respectively.  The true and correct checking account statement for that same month showed the actual "Previous Balance" and "Ending Balance" as: "$3,339.56" and "$2,170.79", respectively.

21.   This type of alteration made it appear as if the Local 350 accounts held tens of thousands of dollars, when in fact, the accounts were being depleted due to JASMIN's ongoing fraud schemes.

22.   Eventually, Local 350's financial position further deteriorated and the alterations to the bank statements that were submitted to the ICWUC became more elaborate.  At several points, the bank statements that were submitted in Local 350's financial reports to the ICWUC were altered to hide the fact that checks issued by Local 350 were bouncing.  Non-sufficient funds (NSF) fees were edited out of the submitted bank statements with their values being added in to other charges.  Also, the true and actual bank statements from United Business Bank lists daily balances throughout the month. These balances were altered in the financial reports to remove any negative account balances.

   **D.   JASMIN Fraudulently Doubled the Union Dues, Presumably So There Would Be More Money to Embezzle from the Union**

23.   Kevin Giles (Giles), previously held the position of Labor Relations Analyst at SoCalGas, where he was responsible for the management and processing of dues for union members employed by SoCalGas. Investigator Krouse interviewed Giles, and Giles stated that he remembered receiving a letter from JASMIN in July 2017.  (The

letter had been sent through the mail and been logged as received on July 13, 2017.)  In this letter, JASMIN informed the SoCalGas Labor Relations Department that the Local 350 union dues "have been adjustd (sic) to $42.00 per pay period effective immediately."  Prior to this letter, Local 350 union dues were at a rate of $21 per pay period.

24.   The dues increase was processed within one or two pay periods.  Giles did not question the dues increase as he was only responsible for inputting the dues rates provided by the local unions.

25.   The increase in dues led to an increase in the amount of money withdrawn from the paychecks of all Local 350 union members, which in turn led to an increase in the deposits from SoCalGas to the Local 350 checking account.  Thus, JASMIN would have been able to access even more money in the Local 350 checking account after the dues increase.

26.   According to interviews with Diaz and Allen, in August 2017, Allen began to receive questions from Local 350 members as to why their dues had increased.  Diaz explained that under Local 350's bylaws, dues can only be raised after a secret-ballot vote by the membership, and when raised, they are usually only raised by around one dollar.  Diaz was unaware of any vote to raise the dues.  Allen attended all of Local 350's membership meetings and was not aware of the dues rate being increased.  Allen stated that when dues were increased, the dues rates were typically not doubled as they were in this situation.

**E.   JASMIN Falsely Claimed the Union Dues Increased Because of SoCalGas's Error, When In Fact She Directed SoCalGas to Increase the Dues**

27.   After the dues were increased, several members contacted Allen to complain around August 2017.  Allen, in turn, contacted JASMIN and asked about the dues increase.  JASMIN told Allen that the dues rate increase was the result of an error by SoCalGas and that the company would correct the error by not deducting the dues for the upcoming pay period.  After the dues continued to be deducted at the higher rate and members continued complaining, Allen contacted Giles at SoCalGas and received a copy of the letter in which JASMIN directed SoCalGas to double the dues.  Allen and Diaz then met with JASMIN and showed her the letter.  Even when confronted with the letter that she had written and submitted to SoCalGas regarding the dues increase, JASMIN continued to insist that it was due to an error by SoCalGas, and claimed reimbursements had already been paid to the entire membership.  To bolster this claim, JASMIN presented Allen and Diaz with a spreadsheet listing the names and check numbers purportedly issued to each member and a bank statement showing numerous outgoing checks.  In late 2018, after Allen obtained true copies of the bank statements and cancelled checks, she discovered that the bank statement presented by Jasmin was a forgery and the list of reimbursement checks provided by JASMIN did not correspond to the actual outgoing checks from Local 350's checking account.

28.   On or about September 13, 2017, Giles received a letter from JASMIN, asking for the dues rate to be returned to the original, lower rate of $21 per pay period.  After approximately six pay periods where members paid double their normal dues, the request was

processed and the dues returned to a rate of $21 per biweekly pay period.

**F.   The Union Calculated JASMIN's Embezzlement at Over $300,000**

29.   Diaz and Allen explained that Reginald O'Malley ("O'Malley"), a retired accountant for the UFCW International Union, was brought in to work with them in order to complete an audit of Local 350's books.  O'Malley prepared a report for the International declaring a loss totaling $305,411 over a period ranging from 2013 through August 2018, which included checks JASMIN wrote to herself and the unauthorized payments made to credit card providers.  A bonding claim was filed for this full amount with Zurich Insurance Group in October 2018.  Phillip Boling, a Litigation Specialist with Zurich, contacted Investigator Krouse on January 20, 2020 requesting restitution for the bond, which was paid in full to Local 350.

**G.   JASMIN Committed Disability Fraud in the Past and Appears to be Committing It Again Now**

30.   According to SoCalGas payroll records, JASMIN took disability leave from at least January 1, 2013 through March 7, 2013; from February 14, 2014 through May 21, 2015; and from August 13, 2018 through the present.  During this leave, JASMIN collected roughly $135,000 in disability payments.

31.   As described below, JASMIN appears to have committed two separate frauds related to disability payments.  First, she does not appear to have been disabled at all.  Indeed, she most recently went on disability leave on the day that her embezzlement scheme described above started to unravel.  Second, while JASMIN claimed to be unable to work due to being disabled, and was in fact receiving disability payments, she nevertheless sought compensation from her union for

hours she purportedly missed working at SoCalGas due to union business.  But because JASMIN was then working no hours at SoCalGas on account of her claimed disability, she missed no work hours at SoCalGas on account of union business, and the money she collected from the union to "reimburse" herself for her purported lost wages at SoCalGas was at least fraudulent double dipping, and may have been entirely fictitious as well.

**H.   JASMIN Does Not Appear to Have Any Disability That Would Prevent Her from Performing Her Job--Answering Telephones— But Rather Appears Not to Want to Work**

32.  Nicole Quach ("Quach") worked with JASMIN in SoCalGas's San Dimas call center and, after being promoted, has been JASMIN's supervisor since 2015.  When interviewed, Quach stated that JASMIN was regularly away from work on vacation leave, sick leave, or for union business which caused Quach to have to scramble to find backup coverage.  When JASMIN was in the office she would constantly avoid working by going "off board," meaning that she would not be routed incoming calls.  When JASMIN took disability leave in August 2018, Quach doubted that JASMIN was actually unable to work because she regularly posted pictures on Instagram of herself at a ranch and riding horses.

33.  JASMIN told Morris that she had cervical cancer, had a hysterectomy, and had undergone chemotherapy but Morris does not believe this is true.  Morris described JASMIN as a hypochondriac. JASMIN told Allen that she had suffered injuries from riding horses and had many medical ailments but Allen now doubts that these ailments were real.  Diaz was told by other members of Local 350 that JASMIN missed work for long periods of time for cancer treatments but

1   Diaz has not seen anything that even circumstantially suggests this

2   is true.

3       34.   The timing of JASMIN's latest disability claim is

4   suspicious.  According to Diaz and Allen, on August 15, 2018, JASMIN

5   was in the middle of a meeting with other union officers at SoCalGas,

6   when she received a phone call from the general counsel for the ICWUC

7   who confronted JASMIN about Local 350's failure to make required

8   monthly payments to the ICWUC.  By this point, according to Diaz,

9   Local 350 owed the ICWUC approximately $85,000 in unpaid monthly

10  payments.  Diaz could not understand why Local 350 was not making

11  payments because the bank statements JASMIN provided made it seem

12  that Local 350 had significant funds.  As described above, however,

13  these bank statements were forgeries and Local 350's accounts had

14  been liquidated due to JASMIN's fraud.  When interviewed, Allen

15  explained that she received calls from the other union officials at

16  SoCalGas who were attending the meeting.  These union officials were

17  asking Allen what had happened because JASMIN left the meeting in

18  tears after she received the call from ICWUC's general counsel.  That

19  same day, JASMIN went on long term disability leave from SoCalGas and

20  remains on disability leave at least through the last date that

21  Investigator Krouse checked, March 3, 2020.

22      **I.   JASMIN Obtained Payments from Her Union to Compensate Her**
            **for Missing Work at SoCalGas to Perform Union Duties, But**
23          **Missed No Such Work as She Was on Disability Leave**

24      35.   According to Diaz and Allen, the union compensates its

25  officers who are hourly employees at SoCalGas when they are required

26  to take time off from SoCalGas to conduct union business.  For

27  example, if JASMIN were to represent a union employee at a

28  disciplinary hearing requiring her to leave her worksite, and

therefore missed four hours of paid work at SoCalGas, the union would pay JASMIN her lost wages for those four hours so that she suffered no financial harm.

36.   Cancelled checks from JASMIN's personal checking account show that when JASMIN was on disability leave, every two weeks SoCalGas issued a check to Jasmin for approximately $1,800.

37.   Local 350's bank statements and cancelled checks show that JASMIN was paid over $27,000 from Local 350's checking account during the times she was on disability leave in 2014 and 2015.  These payments are for time that JASMIN claimed to have missed work to conduct union business, otherwise known as "lost time" payments. This is clear because the checks are for recurring amounts that correspond to either an eight-hour day of wages or a multiple of that amount, and because the memo lines of the checks list purposes such as organizing, training, or meetings.  Because JASMIN was receiving long term disability pay and not working during this time, she did not miss out on wages from work to conduct union business.

**J.   JASMIN Lives at JASMIN'S RESIDENCE**

38.   Since February 2018, JASMIN's known personal credit card statements have been addressed to JASMIN'S RESIDENCE, according to bank records.

39.   On February 19, 2020, SA Joshua Arambulo conducted physical surveillance at JASMIN'S RESIDENCE.  On this day, SA Joshua Arambulo observed a female matching the physical description of JASMIN driving a Maserati vehicle that had been parked in the driveway of the JASMIN'S RESIDENCE.  The Maserati had paper plates, therefore, at that time vehicle registration was not available based on the paper plates.

40.   Per interviews with Morris, she used to have a close friendly relationship with JASMIN.  According to Morris, JASMIN drove a Maserati.  Morris also knew JASMIN's husband, as she recalled his name as David, and believed his last name to be "Vivaros".  According to TLOxp checks for JASMIN, a person named David Pena Vivar was shown to be a "Likely Associate" to JASMIN.

41.   On April 7, 2020, SA Arambulo obtained information from the California State Threat Assessment Center, in which a 2019 Maserati, license plate number 8PDH145, had been registered in California under the name, David Vivar.  A National Law Enforcement Communications Center query of license plate number 8PDH145 revealed that the 2019 Maserati had a valid registration from January 14, 2020 to January 14, 2021, and was registered at JASMIN'S RESIDENCE.

42.   I checked JASMIN's address in the database TLOxp, which uses data provided by Transunion, the credit reporting agency.  It showed that JASMIN's latest reported address remains 116 ROUNDUP RD, GLENDORA CA 91741-3840 (JASMIN'S RESIDENCE) as of June 12, 2020, and that she had been there since 2017.

43.   One June 14, 2020, I drove by JASMIN'S RESIDENCE at approximately 6:15am and saw the Maserati described above parked in the driveway.

**K.   TRAINING AND EXPERIENCE REGARDING FRAUD**

44.   Based on my training and experience, and the experiences of fellow agents, I know the following:  Individuals that engage in fraud schemes and attempt to mask their actions with altered documents and false letters will produce such items with a program or application that has been installed on a digital device, such as a desktop computer, laptop, or tablet;  When accessing bank accounts

from which they intend to electronically transfer funds, individuals will need the use of a device such as the ones previously named, or even a digital device such as a cell phone;  Such digital devices may also contain information regarding websites that had been previously visited by an individual and such information can further aid in identifying how an individual financially benefitted from their fraud scheme(s); Furthermore, such digital devices can aid in identifying if any additional parties or co-conspirators benefitted from the fraud scheme(s) as the devices can retain communication between its user(s) and other possible co-conspirators; Individuals who commit crimes with the aid of such devices do not readily discard them, as computer, tablets, and cell phones are expensive items that are typically used for multiple years before being upgraded or discarded. Further, persons who gain substantial sums from fraud typically possess within their homes and digital devices evidence of the accounts to which they moved their fraud proceeds as well as the purchases they made with those proceeds.

**L.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

45.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of

1    time.  Similarly, files viewed on the Internet are often

2    automatically downloaded into a temporary directory or cache that are

3    only overwritten as they are replaced with more recently downloaded

4    or viewed content and may also be recoverable months or years later.

5         b.   Digital devices often contain electronic evidence

6    related to a crime, the device's user, or the existence of evidence

7    in other locations, such as, how the device has been used, what it

8    has been used for, who has used it, and who has been responsible for

9    creating or maintaining records, documents, programs, applications,

10   and materials on the device.  That evidence is often stored in logs

11   and other artifacts that are not kept in places where the user stores

12   files, and in places where the user may be unaware of them.  For

13   example, recoverable data can include evidence of deleted or edited

14   files; recently used tasks and processes; online nicknames and

15   passwords in the form of configuration data stored by browser, e-

16   mail, and chat programs; attachment of other devices; times the

17   device was in use; and file creation dates and sequence.

18        c.   The absence of data on a digital device may be

19   evidence of how the device was used, what it was used for, and who

20   used it.  For example, showing the absence of certain software on a

21   device may be necessary to rebut a claim that the device was being

22   controlled remotely by such software.

23        d.   Digital device users can also attempt to conceal data

24   by using encryption, steganography, or by using misleading filenames

25   and extensions.  Digital devices may also contain "booby traps" that

26   destroy or alter data if certain procedures are not scrupulously

27   followed.  Law enforcement continuously develops and acquires new

28

methods of decryption, even for devices or data that cannot currently be decrypted.

46. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

47. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device

will automatically unlock if that physical feature matches one the
user has stored on the device.  To unlock a device enabled with a
fingerprint unlock function, a user places one or more of the user's
fingers on a device's fingerprint scanner for approximately one
second.  To unlock a device enabled with a facial, retina, or iris
recognition function, the user holds the device in front of the
user's face with the user's eyes open for approximately one second.

        b.    In some circumstances, a biometric unlock function
will not unlock a device even if enabled, such as when a device has
been restarted or inactive, has not been unlocked for a certain
period of time (often 48 hours or less), or after a certain number of
unsuccessful unlock attempts.  Thus, the opportunity to use a
biometric unlock function even on an enabled device may exist for
only a short time.  I do not know the passcodes of the devices likely
to be found in the search.

        c.    Thus, the warrant I am applying for would permit law
enforcement personnel to, with respect to any device that appears to
have a biometric sensor and falls within the scope of the warrant:
(1) depress AJA JASMIN's thumb and/or fingers on the device(s); and
(2) hold the device(s) in front of AJA JASMIN's face with her eyes
open to activate the facial-, iris-, and/or retina-recognition
feature.

    48.  Other than what has been described herein, to my knowledge,
the United States has not attempted to obtain this data by other
means.

**CONCLUSION**

    49.  Based upon the foregoing facts and my training and
experience, I believe there is probable cause to believe that fruits,

instrumentalities and evidence of violations of the Subject Offenses will be found at JASMIN'S RESIDENCE.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __15th__ day of June, 2020.

UNITED STATES MAGISTRATE JUDGE

March 8, 2021

My name is Rachel Arguello, current president of ICWUC/UFCW Local 350.  The purpose of this letter is to convey the hardship endured by the local due to the actions of our former president, Aja Jasmin.  At the time of her tenure I was the Recorder.

The actions of Ms. Jasmin go beyond deception, and disloyalty to the local.  During the last couple of years, we the local have had to deal with correcting the consequences of her actions as well as restoring trust and faith to our membership.

We feel we were deceived by not only our leader, union sister, and friend but were manipulated during her tenure.  Ms. Jasmin filled our executive board with false hope and deliberately mislead us in believing that certain issues were being handled.

One issue that arose was a doubling of dues that caused members to pay twice what was owed.  We began to receive calls from our members informing us that their dues were doubled and when brought to her attention, she assured us it was a mistake and was being corrected.  She told us that reimbursement checks would be issued to the affected members right away.  This issue continued and we received more phone calls from members relaying to us that no reimbursement checks were received.  We inquired from her again and eventually checks were sent.  At the time we fully believed this had been an error on the company's side and it wasn't until she stepped down and everything was brought to light that we discovered this was yet another tactic to disadvantage the local financially for her personal gain.

I personally had requested audits to be conducted and they were always scheduled on days that I was unavailable. At the time I felt that perhaps her demeaner towards me was due to us running for president against each other previously.  One of the times I was available and attended, I began to question some of the information being provided and missing previous audit information needed to complete the audit and she excused it away by saying she had forgotten to bring all the information, therefore we would reconvene at a later time and continue the audit.  Which never occurred.

Ms. Jasmin abused the trust we had in her.  We have all worked together closely both in the union and workplace and she had been part of the union in other capacities for a long time prior to becoming president.  Nothing in the past lead us to believe that she was falsifying documents and forging signatures.  The signatures she was forging was not only of executive board members but one of her closest friends.  It was such a shock that the board member did not initially believe this had occurred until presented with the evidence.  Unfortunately, Ms. Jasmin has shown no remorse for putting her friend's livelihood in possible jeopardy.

On the last executive board meeting we had with her, before her resignation; Ms. Jasmin walked into the meeting and noticed our national representative there, she became enraged and stormed out with our Recorders book.  A few of us followed her out and requested the Recorder's book and the checkbook. She gave us the Recorders book but claimed she had given the check book to our National Representative. She again became enraged and told us why we are questioning her actions and was offended that we did not trust her and her loyalty to the local.  After this event, we were unsuccessful and getting her to cooperate with us.  She refused to turn over financial documents and other property of the local.

Our local has gone through a tumultuous time where we were left wondering if we would be able to continue.  We feared being put under trusteeship and if we would continue to have membership support to run the local.  We reached out to our national representatives and asked for a chance to save the local.  We were fortunate to be given the support and today our local is in a much better state of affairs, but it has been no easy task.  Speaking on behalf of the local, we ask you to take this letter into consideration from our viewpoint and the consequences that we had to deal with. We strive to provide the best representation for our members and are confident we can restore their trust in our local.

I am asking for Ms. Jasmin to be punished to fullest extent possible and to be banned from ever holding any Union Executive Office.

We appreciate your time and attention.

Sincerely,

Rachel P. Arguello

President ICWUC/UFCW Local 350C

March 8, 2021

RE: Aja A Jasmin, former President ICWUC/UFCW Local 350C

To whom it may concern,

My name is LaDasha Morris, former President of Local 350C. I am writing this letter to express how Ms. Jasmin's criminal acts impacted the local and myself.

At the time of her actions I was the financial secretary of the local. I was very green as an officer and a steward. Ms. Jasmin encouraged me to run for office and committed to train and mentor me through this process. I trusted she had the best interest of the local and mine as we were coworkers and friends. She did provide me with some training, mostly on how to represent our members (e.g. Investigatory and grievance meetings). As far as the bookkeeping and records keeping, she provided minimal training. She decided as president of the local, to continue to do the bookkeeping. She never added me to the locals' bank accounts. Although she told me on many occasions, we would be taking care of that. Like I mentioned earlier I was very green, and now realize that she used my lack of experience and trust in her for her own personal gain.

Ms. Jasmin actions tarnished the locals and its executive board members reputations. As the financial officer she potentially exposed me to legal issues and possibly putting my livelihood in jeopardy. As well as other executive board members. She has never taken any accountability for her actions.  Instead was quick to continue to deceive us. One example of this is on several occasions we asked her to turn over all the local's property, including financial records and checkbooks. She never did. Yet said she had provided to our International representative and on another occasion to me.

We trusted our union sister and friend, as Ms. Jasmin had been involved with the local union in many roles and offices prior to becoming president. We had all worked side by side with her, together both in our workplace and in the union. Never would have I believed she would betray our trust. We are still in shock that she could falsify documents, double union dues, and forage signatures in order to unlawfully obtain hundreds of thousands of dollars. But could not deny once evidence was presented to us.

Ms. Jasmin has shown no remorse for her actions and how they have impacted the local and our members. On behalf of our local and myself, I am asking she be punished to fullest extent of the law and that she be banned from holding any Union office. A message must be sent that these acts will not go unpunished.

Respectfully,

LaDasha Morris